NO. 07-06-0099-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



OCTOBER 9, 2007


 ______________________________



CHARLES RAY GIBSON, JR., APPELLANT



V.



THE STATE OF TEXAS, APPELLEE


_________________________________



FROM THE 121ST DISTRICT COURT OF TERRY COUNTY;



NO. 5273; HONORABLE KELLY G. MOORE, JUDGE


_______________________________




Before CAMPBELL and HANCOCK and PIRTLE, JJ.

OPINION


 Appellant, Charles Ray Gibson, Jr., appeals his conviction for possession of a
controlled substance (cocaine) and sentence of 99 years incarceration in the Institutional
Division of the Texas Department of Criminal Justice. We reverse.

Background

 On October 1, 2004 at around 11:15 p.m., Rose Waitman called the Brownfield
Police Department out of concern that her daughter (C.W.), who was 15 years old at the
time, had not returned home from a high school football game. Officer Carrillo was
dispatched to the Waitman residence. Rose told Carrillo that C.W. may be in a blue 1989
"Pontiac Oldsmobile (sic)" and she gave him the license plate number of the vehicle. Rose
requested that Carrillo find her daughter and bring her home.

 At approximately 11:45 p.m., Carrillo spotted a vehicle that matched the description
of the vehicle given by Waitman. Carrillo could not identify its occupants or even how
many occupants were in the vehicle. Carrillo pulled behind the vehicle, activated his
emergency lights, and followed the vehicle to effectuate the stop. At no time after Carrillo
spotted the vehicle did he observe the driver violate any traffic laws. After the vehicle
stopped, Carrillo spoke with the driver, who he identified as appellant, told him that he had
been stopped "for the juvenile," and asked appellant to exit the vehicle. After appellant
exited the vehicle, Carrillo asked him for his driver's license and proof of insurance. 
Another officer, who was assisting Carrillo, removed C.W. from the vehicle. Appellant told
Carrillo that he did not have a license or proof of insurance. Carrillo ran a license inquiry
through dispatch and was able to verify that appellant did not have a valid driver's license. 
As a result, Carrillo placed appellant under arrest. Following appellant's arrest, the vehicle
was searched incident to the arrest. Cocaine and marijuana were discovered in or next to
the vehicle.

 Appellant filed a pre-trial Motion to Suppress the drugs contending that they were
discovered as a result of an illegal search and seizure. A hearing was held on the motion
with Carrillo being the only testifying witness. Carrillo testified that he was aware that
appellant did not have a driver's license based on a past encounter with him, however, he
expressly stated that he did not pull the vehicle over for this reason. Rather, Carrillo
testified that he stopped the vehicle because it matched the description given by C.W.'s
mother, who was concerned about her daughter's welfare. The trial court denied the
Motion to Suppress the evidence.

 At trial, C.W. testified regarding the events of October 1, 2004. She testified that
she and appellant left the football game before it ended. Appellant stopped by a house for
a brief period while C.W. waited in the car. Appellant took C.W. back to the football game,
but the game had ended and C.W. could not find the person that was to give her a ride
home. As a result, appellant agreed to take C.W. home. As appellant was attempting to
give C.W. a ride home, Carrillo pulled appellant over. As Carrillo approached the vehicle,
appellant pulled drugs out of his pocket, handed them to C.W., and told her to "chunk them
out the window." However, because another officer approached the passenger's side
window at the same time that Carrillo approached the driver's side, C.W. testified that she
laid the drugs beside the seat.

 Also, at trial, C.W.'s mother, Rose, testified that she called the police to look for her
daughter because she was "concerned" when she did not come home with the people that
she went to the game with. Rose had been informed that C.W. was with appellant, but she
"didn't want her in the car with him." 

 Carrillo testified that he went and spoke with Rose and that she was very concerned
about her daughter. He testified that Rose told him that C.W. had left the football game
around 10:20 with appellant. Carrillo spotted appellant's vehicle driving in the direction of
C.W.'s home at 11:48. After Carrillo stopped the vehicle, he testified that he approached
the driver, identified himself, and advised the driver that he was being stopped "for the
juvenile." At the same time, another officer made contact with C.W. on the passenger's
side of the vehicle. Carrillo asked appellant to step out of the vehicle and for his driver's
license and proof of insurance. When appellant failed to produce these documents,
Carrillo called in a driver's license check that indicated that appellant's driver's license had
expired in 1993. As a result, Carrillo arrested appellant. After appellant was placed under
arrest, his vehicle was searched and cocaine and marijuana were found on the floorboard
of the front passenger's area.

 At the close of evidence, the court took up the issue of the jury charge. The court's
proposed charge included an instruction that an accomplice witness's testimony must be
corroborated. The State objected to the inclusion of this instruction on the basis that the
evidence was insufficient to establish that C.W. was an accomplice, but the court overruled
the objection. Appellant then objected to the charge not including an instruction under
Texas Code of Criminal Procedure article 38.23, which was overruled by the court. See
Tex. Code Crim. Proc. Ann. art. 38.23 (Vernon 2005). (1) 

 The jury returned a verdict finding appellant guilty of possession of a controlled
substance, cocaine, in an amount more than four grams but less than 200 grams. The
indictment included enhancement allegations of two prior felony convictions to which
appellant pled true. The jury heard the punishment evidence and assessed a sentence of
incarceration in the Institutional Division of the Texas Department of Criminal Justice for
a period of 99 years. Appellant filed a Motion for New Trial, which was overruled by
operation of law.

 Appellant presents four issues on appeal. Appellant's first issue contends that the
trial court erred in denying appellant's Motion to Suppress. By his second issue, appellant
contends that the evidence was insufficient to corroborate the testimony of C.W., who
appellant contends was an accomplice. Appellant's third issue contends that the trial court
erred in failing to include an instruction under article 38.23 in the jury charge. Finally, by
his fourth issue, appellant contends that the evidence was legally insufficient to support his
conviction. We will address only appellant's first and fourth issues. See Tex. R. App. P.
47.1.

Legality of the Stop

 By his first issue, appellant contends that the trial court erred in denying his Motion
to Suppress the cocaine found by the police when they searched his vehicle incident to
arrest because the initial stop of his vehicle was illegal in that it was not supported by
reasonable suspicion. The State contends that the initial stop of appellant was justified by
the community caretaking function of the officers. 

 When reviewing a motion to suppress, we are to give great deference to a trial
court's determination of historical facts and on mixed questions of law and fact that require
an evaluation of credibility and demeanor. Guzman v. State, 955 S.W.2d 85, 89
(Tex.Crim.App. 1997). However, mixed questions of law and fact not turning on an
evaluation of credibility and demeanor are reviewed de novo. Id. See also Villareal v.
State, 935 S.W.2d 134, 139 (Tex.Crim.App. 1996) (McCormick, P.J., concurring) (if trial
court "is not in appreciably better position" than the appellate court in deciding an issue,
the appellate court may independently determine the issue while affording deference to the
trial court's finding on subsidiary factual questions). Where the facts relating to a motion
to suppress are undisputed and the trial court's ruling does not turn on the credibility of the
witnesses, an appellate court reviews an order overruling the motion de novo. Johnson
v. State, 146 S.W.3d 719, 721 (Tex.App.-Texarkana 2004, no pet.). 

 While not all encounters with the police implicate the Fourth Amendment's
protection against unreasonable seizures, stopping an automobile and detaining its
occupants constitutes a seizure, even though the purpose of the seizure is limited and the
resulting detention brief. Del. v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660
(1979); Corbin v. State, 85 S.W.3d 272, 276 (Tex.Crim.App. 2002). Under the Fourth
Amendment, a seizure must be objectively reasonable in light of the particular
circumstances of the case. Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d
889 (1968); Corbin, 85 S.W.3d at 276. Assessing the reasonableness of a search or
seizure requires a balancing of the public interest and the individual's right to be free from
arbitrary interference by law enforcement. Prouse, 440 U.S. at 654; Corbin, 85 S.W.3d at
276. A seizure based on reasonable suspicion or probable cause will generally be
reasonable. Whren v. United States, 517 U.S. 806, 818, 116 S.Ct. 1769, 135 L.Ed.2d 89
(1996); Corbin, 85 S.W.3d at 276. However, even without reasonable suspicion or
probable cause that an offense has been committed, a police officer may reasonably seize
an individual through the exercise of his community caretaking function. Corbin, 85 S.W.3d
at 276; Wright v. State, 7 S.W.3d 148, 151-52 (Tex.Crim.App. 1999). For a seizure to be
justified by the community caretaking function, it must have been primarily motivated by
the need to assist and the officer's belief that the need exists must have been reasonable. 
See Corbin, 85 S.W.3d at 277.

 As part of a police officer's duty to "serve and protect," an officer "may stop and
assist an individual whom a reasonable person, given the totality of the circumstances,
would believe is in need of help." Wright, 7 S.W.3d at 151. However, the community
caretaking function is "totally divorced" from the detection, investigation, or acquisition of
evidence relating to the violation of a criminal statute. Corbin, 85 S.W.3d at 276-77. Thus,
for the exercise of the community caretaking function to justify a seizure, its primary
purpose must be for the welfare of the individual in need of assistance. Id. at 277. 

 If it is determined that a seizure was primarily motivated to fulfill the community
caretaking function, it must then be determined whether the officer's belief that the person
needed help was reasonable. Corbin, 85 S.W.3d at 277; Wright, 7 S.W.3d at 151-52. In
evaluating the reasonableness of the officer's belief that help was needed, courts may look
to four non-exclusive factors (hereafter, "the Wright factors"): (1) the nature and level of the
distress exhibited by the individual; (2) the location of the individual; (3) whether the
individual was alone and/or had access to assistance other than that offered by the officer;
and (4) to what extent the individual, if not assisted, presented a danger to himself or
others. Id. In reviewing these factors, the nature and level of distress exhibited is entitled
to the greatest weight. Corbin, 85 S.W.3d at 277.

 In the present case, it is undisputed that Carrillo lacked reasonable suspicion or
probable cause to stop appellant's vehicle. Carrillo provided no testimony that he was
aware of or suspected that appellant was involved in the commission of a crime at the time
Carrillo stopped his vehicle. Further, Carrillo specifically testified that he did not observe
appellant violate any traffic laws prior to the stop. Therefore, appellant contends that the
initial stop was illegal and that any evidence discovered as a result of the stop was tainted
by the illegality of the stop and the trial court erred in allowing this evidence over
appellant's objection.

 The State, however, contends that the stop of appellant's vehicle was legal because
the stop was effectuated in furtherance of the officer's community caretaking function. (2) 
The record reflects that C.W.'s mother contacted the police when C.W. failed to return
home from the football game at the expected time. Carrillo testified that his "biggest
concern" in stopping appellant's vehicle was "[t]he child's safety being that she was a
juvenile and he was in his 30's (sic)." However, Carrillo further testified that he was aware
that appellant did not have a valid driver's license, based on prior encounters with
appellant. Therefore, we conclude that this testimony raised a fact question as to the
primary motivation for the stop. This fact issue was impliedly resolved by the trial court in
favor of the valid exercise of the community caretaking function. In reviewing a trial court's
ruling on a motion to suppress, we may not sit as a second trier of fact determining the
credibility and demeanor of witnesses. See State v. Ross, 32 S.W.3d 853, 858
(Tex.Crim.App. 2000). Thus, we must accept the trial court's implied determination that
Carrillo effectuated the stop of appellant based on a primary motivation to fulfill his
community caretaking function. (3)

 For a seizure to be justified as an exercise of the community caretaking function, an
officer's subjective belief that the seizure is necessary to render assistance to a person in
need must be shown to have been objectively reasonable. Id. In assessing the
reasonableness of the officer's belief, we look to the four Wright factors. 

 The first, and most important, Wright factor is the nature and level of the distress
exhibited by the individual. Id. In the present case, Rose testified that she was
"concerned" about her daughter not returning home from the football game at the
designated time and in the designated manner. Rose also testified that she told the police
that she did not want her daughter in a car with appellant, but she provided no further
elaboration as to why she did not want her daughter with appellant. The only evidence of
the nature and level of C.W.'s distress at the time that appellant was stopped was that
C.W. was no more than one and a half hours late and that, for some unstated reason,
Rose did not want C.W. in a vehicle with appellant. We conclude that this evidence is
insufficient to establish that C.W. exhibited a nature and level of distress sufficient to
independently justify the stop of appellant as an objectively reasonable exercise of the
community caretaking function.

 However, while the first Wright factor is entitled to the greatest weight, it is not
always dispositive. Id. The three remaining factors help to give more definition to the first
factor and may reveal that a particular level of distress is more or less serious depending
on the presence or absence of these factors. Id. In looking at the second factor, the
location of the individual, the record reflects that appellant was stopped a couple of houses
before he reached C.W.'s home and that Carrillo was aware of the proximity of the stop to
C.W.'s home as a result of his having recently spoken with Rose at the house. The
proximity of the stop to C.W.'s home and the reasonable inference that appellant was in
the process of taking C.W. home mitigates against C.W. being in sufficient distress to
justify the stop. The third factor asks whether the individual in distress was alone and/or
had access to assistance other than that offered by the officer. As to the initial stop,
Carrillo testified that he could not identify any individuals in appellant's vehicle nor could
he identify the number of individuals in the vehicle. Therefore, this factor could not support
the initial stop. Finally, the fourth factor, the extent to which the individual, if not assisted,
posed a danger to himself or others, weighs against the stop. The record provides no
evidence of how C.W. was placed in danger by getting a ride home from appellant. To the
extent that the fourth factor is to be applied to appellant, there is no evidence that appellant
was driving erratically or in a manner that would pose a danger to himself or to others on
the roadways. Also, there was no evidence that appellant posed a threat to C.W, rather,
the only evidence was that Rose did not want C.W. with appellant. 

 Considering the Wright factors in light of the totality of the circumstances, we
conclude that the evidence failed to establish that the stop of appellant's vehicle was an
objectively reasonable exercise of the community caretaking function. As the State does
not dispute that the stop was not supported by probable cause or reasonable suspicion
and because we conclude that the stop was not shown to have been a valid exercise of the
community caretaking function, we conclude that the stop was illegal and, therefore, the
cocaine which was subsequently found was the fruit of the illegal stop. See Crosby v.
State, 750 S.W.2d 768, 780 (Tex.Crim.App. 1987). Therefore, we conclude that the trial
court erred in denying appellant's Motion to Suppress this evidence.

Harm

 Having found error in the denial of appellant's Motion to Suppress, we must also
conduct a harm analysis to determine whether the error calls for reversal of the judgment. 
Tex. R. App. P. 44.2. The harm analysis for the erroneous admission of evidence obtained
in violation of the Fourth Amendment is Rule 44.2(a)'s constitutional standard. Hernandez
v. State, 60 S.W.3d 106, 108 (Tex.Crim.App. 2001). Accordingly, we must reverse the trial
court's judgment, unless we determine beyond a reasonable doubt that the error did not
contribute to appellant's conviction or punishment. Tex. R. App. P. 44.2(a). The question
is whether the trial court's denial of Appellant's Motion to Suppress and its admission of the
evidence were harmless beyond a reasonable doubt. See Williams v. State, 958 S.W.2d
186, 194 (Tex.Crim.App. 1997). In applying the "harmless error" test, we ask whether
there is a "reasonable possibility" that the error might have contributed to the conviction.
Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), cert. denied, 526 U.S. 1070,
119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). 

 In the present case, the evidence obtained as a result of the illegal stop formed the
basis of appellant's conviction. After carefully reviewing the record and performing the
required harm analysis under Texas Rule of Appellate Procedure 44.2(a), we are unable
to determine beyond a reasonable doubt that the erroneous admission of the cocaine did
not contribute to appellant's conviction. Therefore, because the trial court's error in
denying appellant's Motion to Suppress was harmful to appellant, we will reverse the
judgment. 

Legal Sufficiency

 By his fourth issue, appellant contends that the evidence was legally insufficient to
support his conviction. Appellant's argument concerning the sufficiency of the evidence
is that there were insufficient links to establish that appellant possessed the narcotics if
C.W.'s testimony had been properly excluded as insufficiently corroborated accomplice
testimony. 

 However, even were we to determine that C.W. was an accomplice and her
testimony was not sufficiently corroborated, an issue we need not address in this opinion
due to our resolution of appellant's challenge of the trial court's denial of his Motion to
Suppress, see Tex. R. App. P. 47.1, we would have to consider her testimony in
determining whether the evidence was legally sufficient. See Green v. State, 893 S.W.2d
536, 540 (Tex.Crim.App. 1995) (when sufficiency of evidence is challenged following a jury
trial, appellate courts consider all of the evidence, whether properly or improperly
admitted). While not expressly challenged by his legal sufficiency issue, we must also
consider the cocaine that we have previously concluded was improperly admitted in
assessing the legal sufficiency of the evidence. See id.

 Considering all of the evidence, whether properly or improperly admitted, in the light
most favorable to the verdict, we conclude that the evidence was sufficient to establish that
appellant intentionally and knowingly possessed a controlled substance, cocaine, in an
amount of four grams or more, but less than 200 grams. We overrule appellant's legal
sufficiency challenge.

Conclusion 

 Having determined that the trial court committed reversible error in denying
appellant's Motion to Suppress, we reverse the trial court's judgment and remand for
further proceedings consistent with this opinion.

 

 Mackey K. Hancock

 Justice



Publish. 


Pirtle, J., concurring. 

 
1. Further reference to provisions of the Texas Code of Criminal Procedure will be
by reference to "article __."
2. In analysis of the trial court's ruling on the Motion to Suppress, we will assume,
without deciding, that the community caretaking function justifies a seizure of an individual
other than the individual believed to be in need of assistance. But see Wright, 7 S.W.3d
at 151-52 (may stop and assist the individual exhibiting distress and believed to be in need
of assistance).
3. While Carrillo specifically testified that he did not stop appellant's vehicle based
on his knowledge that appellant did not have a driver's license, we agree with appellant
that, at trial, this testimony was sufficient to raise a fact question as to the true motivation
for the stop. Therefore, we agree with appellant's third issue that the trial court erred in
failing to submit an instruction in the jury charge in accordance with article 38.23. See
Murphy v. State, 640 S.W.2d 297, 299 (Tex.Crim.App. 1982) (jury instruction required
when evidence raises a fact question regarding the legality of the search or seizure). 
However, because we conclude that the trial court erred in denying appellant's Motion to
Suppress, the trial court's erroneous failure to instruct the jury in accordance with article
38.23 is rendered moot.



style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpMiddle, li.MsoTitleCxSpMiddle, div.MsoTitleCxSpMiddle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpLast, li.MsoTitleCxSpLast, div.MsoTitleCxSpLast
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoSubtitle, li.MsoSubtitle, div.MsoSubtitle
 {mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Subtitle Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.EndnoteTextChar
 {mso-style-name:"Endnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Endnote Text";
 mso-bidi-language:EN-US;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-bidi-language:EN-US;}
span.pmterms11
 {mso-style-name:pmterms11;
 mso-style-unhide:no;
 color:black;
 font-weight:bold;
 font-style:normal;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-09-301-CR%20thru%2007-09-0306-CR%20%20Opinion_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-09-301-CR%20thru%2007-09-0306-CR%20%20Opinion_files/header.htm") fcs;
 mso-endnote-separator:url("07-09-301-CR%20thru%2007-09-0306-CR%20%20Opinion_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-09-301-CR%20thru%2007-09-0306-CR%20%20Opinion_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-09-301-CR%20thru%2007-09-0306-CR%20%20Opinion_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
-->








NOS. 07-09-0301-CR, 07-09-0302-CR,
07-09-0303-CR, 

07-09-0304-CR,
07-09-0305-CR, 07-09-0306-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL D 

 

 AUGUST 20, 2010



 

 



 

 

VIENGKHONE SIKALASINH, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 

 



 

 FROM THE 47TH DISTRICT COURT OF POTTER
COUNTY;

 

NOS. 58,210-A, 58,211-A, 58,212-A, 58,213-A, 58,216-A, 58,217-A;

 HONORABLE HAL MINER, JUDGE



 

 



 

Before QUINN, C.J.. and CAMPBELL and PIRTLE, JJ.

OPINION

            Appellant, Viengkhone Sikalasinh,[1]
was convicted by a jury of three counts of aggravated assault with a deadly
weapon, one count of aggravated assault with a deadly weapon--family member, and
two counts of aggravated robbery, each enhanced by a prior felony conviction.[2]  He was sentenced by a jury to six concurrent
sentences of twenty, twenty, ten, sixty, fifteen, and fifteen years confinement,
respectively.  Appellant asserts three
issues on appeal:  (1) whether the trial
court erred by requiring him to pay court-appointed attorney fees as a cost; (2)
whether there was legally sufficient evidence that he was able to pay
court-appointed attorney fees as a cost; and (3) whether he should be required
to pay transportation, meal and lodging expenses of a non-resident witness who
was neither an expert witness nor a peace officer.  We modify the trial court's judgment in Cause
No. 58,210-A to clarify that payment of $16,510.26 in court-appointed attorney
fees and $537.05 in witness fees is not a part of the court costs ordered in
the case and affirm the judgment as modified. 
The judgments in Cause Nos. 58,211-A, 58,212-A,
58,213-A, 58,216-A, and 58,217-A are affirmed.

Background

            On October 1, 2008, Appellant was indicted for aggravated assault with a
deadly weapon enhanced in three criminal actions;[3]  aggravated assault with a deadly
weapon--family member in a single criminal action;[4]
and aggravated robbery in two criminal actions.[5]  

            During
the course of the pretrial proceedings, Appellant filed three affidavits
requesting court-appointed counsel.  His
financial information showed he was too poor to employ counsel, and the trial
court granted his requests based upon financial need.[6]

            The State's six criminal actions
against Appellant were consolidated on August 10, 2009, and tried before a jury
over the next four days.  During its
case-in-chief, the State called the manager of the apartment complex where
Appellant's crime spree had occurred.  At
the time of trial, this particular witness had moved to McLennan County,
Texas.  Thus, the State subpoenaed her to
trial as an out-of-county or non-resident witness.

            Appellant
was convicted of all charges and sentenced in accordance with the jury's
verdict.  Subsequently, the trial court
approved a Witness Fee Claim for the non-resident witness's trial attendance
totaling $537.05 for lodging, meal, and travel expenses incurred.[7]  The trial court also approved an Attorney Fee
Voucher submitted by Appellant's court-appointed attorney for services rendered
from July 10, 2009 until the end of trial totaling $16,510.26.

            On September 1, 2009, the trial
court signed Judgments of Conviction by Jury in each of the six cases consolidated
for trial.  In each case, the summary
portion of the judgment reflects "Court Costs: see attached," while
the narrative portion of the judgment orders Appellant to pay court costs
"as indicated above."  In the
Clerk's Record from Cause No. 07-09-0301-CR (trial court Cause No. 58,210-A),
the first page following the judgment is a certified bill of costs, also dated
September 1, 2009, that reflects "Attorney Fees (Court Appointed)
$16,510.26" and "Witness Fee $537.05."  In the remaining five criminal actions, Cause
Nos. 07-09-0302-CR, 07-09-0303-CR, 07-09-0304-CR, 07-09-0305-CR and 07-09-0306-CR
(trial court Cause Nos. 58,211-A, 58,212-A, 58,213-A, 58,216-A, and 58,217-A,
respectively), the first page following the judgment in the Clerk's Record is a
certified bill of costs reflecting no attorney's fees and no witness fees.  

            Issues 1 & 2 -- Court-Appointed
Attorney Fees

            Under article 26.05 of the Texas Code
of Criminal Procedure, the trial court has authority to order reimbursement of
appointed attorney fees if the court determines that a defendant has financial
resources that enable him to offset, in part or in whole, the cost of legal
services provided.  See
Tex. Code Crim. Proc. Ann. art. 26.05(g) (Vernon Supp.
2009).  The record before us,
however, does not contain a determination or finding by the trial court that
Appellant had any financial resources or was "able to pay" any appointed
attorney fees.[8]  In fact, subsequent to the judgment, the
trial court appointed an attorney to handle Appellant's appeal due to his
indigency.  

            Prior
to filing his appeal, Appellant did not have the benefit of the recent opinion
by the Court of Criminal Appeals holding that, without record evidence to
demonstrate a defendant's financial resources to offset the costs of legal
services, a trial court errs if it orders reimbursement of court-appointed
attorney fees.  Mayer v. State, 309 S.W.3d 552
(Tex.Crim.App. 2010).  In light of
this recent ruling, the State candidly concedes that the court-appointed
attorney fees here, $16,510.26, should not have been included in the Judgment
as costs to be paid by Appellant because there is no record evidence indicating
Appellant is "able to pay."  We
agree.  Accordingly, Appellant's issues
one and two are sustained as to Cause No. 07-09-0301-CR (trial court Cause No.
58,210-A), but are overruled as to the remaining five actions.

            Issue
3 -- Witness Fees

            Appellant also asserts he is not
liable for the non-resident witness fees because there is no authority for him
to be ordered to pay, as costs of court, witness fees paid pursuant to article
35.27[9]
of the Texas Code of Criminal Procedure.[10]  The State contends that article 102.002 of
the Texas Code of Criminal Procedure authorizes the trial court to assess
witness fees paid pursuant to article 35.27 as costs of court.   We disagree with the State.   

            Every
person subpoenaed for the purpose of giving testimony in a criminal proceeding
who resides outside the county in which the prosecution is pending is entitled
to be reimbursed by the state for reasonable and necessary transportation,
meal, and lodging expenses incurred by that witness by reason of his or her
attendance as a witness.  See art. 35.27, § 1(a).  Where a county has paid those expenses, the
county is entitled to reimbursement by the state as an assignee of the
witness.  See art. 35.27 §
7.  Here, pursuant to article
35.27, § 7, Potter County was paid the sum of
$537.05 as compensation for the expenses incurred in connection with the attendance
of the non-resident witness in Appellant's case.  At issue here is whether the trial court properly
assessed the amount of that reimbursement against Appellant as costs of court.

            Article
35.27 provides a mechanism for the reimbursement of witness expenses; it does
not provide for the assessment of those expenses as costs of court.  Therefore, the State relies upon article
102.002 as authority for assessment of "witness fees" as costs of
court.  Because article 102.002 does not
expressly provide for the assessment of article 35.27 payments as costs of
court, resolution of this issue involves the statutory construction of article
102.002.




            Standard of Review

            Issues governed by statutory construction are questions
of law for the reviewing court to decide. 
City of Lubbock
v. Adams, 149 S.W.3d 820, 826-27 (Tex.App.--Amarillo 2004, pet. denied).  Because proper statutory construction is a
question of law, a trial court has no discretion in rendering an
interpretation; Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992), and no particular deference need be given to the
trial court's findings by the reviewing court. 
Bandera v.
Indep. Sch.
Dist. v. Hamilton, 2 S.W.3d 367, 370
(Tex.App.--San Antonio 1999, pet. denied).  Thus, when we construe a statute, we conduct
a de novo review; Texas Dep't of Transp. v. Needham, 82
S.W.3d 314, 318 (Tex. 2002), with our primary objective being to ascertain and
give effect to the Legislature's intent. 
Texas Dept. of
Protective and Regulatory Services v. Mega Child Care, 145 S.W.3d 170, 176
(Tex. 2004).  We construe a
statute as written and, if possible, ascertain the legislative intent from the
language used in the statute.  Union Bankers Ins. Co. v.
Shelton, 889 S.W.2d 278, 280 (Tex. 1994).  Thus, we begin with the plain and common
meaning of the statute's words.  Texas Dept. of Transp. v.
City of Sunset Valley, 146 S.W.3d 637, 642 (Tex. 2004).

            Article 102.002 -
Texas Code of Criminal Procedure

            Chapter 102 of the Texas Code of
Criminal Procedure, entitled "Costs Paid by Defendants," provides a
general framework for the assessment of costs by a trial court in a criminal
proceeding.[11]  Under Subchapter A, entitled "General
Costs," we find article 102.002 dealing with "witness fees."

            Article
102.002 states as follows:

(a) Repealed
by Acts 1999, 76th Leg., ch. 580, Sec. 11(a), eff.
Sept. 1, 1999.

(b) The justices of the peace and municipal courts shall maintain a
record of and the clerks of district and county courts and county courts at law
shall keep a book and record in the book:

(1) the number and style of each criminal action
before the court;

(2) the name of each witness subpoenaed,
attached, or recognized to testify in the action; and 

(3) whether the witness was a witness for the
state or for the defendant.

(c) Except as otherwise provided by this subsection, a defendant is liable on conviction for the fees provided by this
article for witnesses in the defendant's case. 
If a defendant convicted of a misdemeanor does not pay the
defendant's fines and costs, the county or municipality, as appropriate, is
liable for the fees provided by this article for witnesses in the defendant's
case.

(d)  If a person is subpoenaed as a
witness in a criminal case and fails to appear, the person is liable for the
costs of an attachment, unless he shows good cause to the court why he did not
appear.

(Emphasis added).

            Pursuant
to article 102.002, in order for a defendant to be liable for witness fees, three
events must occur: (1) the defendant must be convicted, (2) the witness must
have testified in the "defendant's case," and (3) the fees must be "provided
by this article," i.e., article 102.002. 
See art. 102.002(c).  Here, clearly Appellant was convicted;
therefore, the two questions remaining are (1) whether or not the witness testified
in the defendant's case, and (2) whether the fees paid were provided by
article 102.002.

            As
to the first question, Appellant contends that because the non-resident witness
testified in the State's case-in-chief only, she did not testify in the "defendant's
case."  The State disagrees,
contending that the article applies because the non-resident witness was a
witness in the prosecution of the defendant's case.  Based upon our analysis of the second question
pertaining to whether the fees were provided by article 102.002, we need not
decide this question.

            As
to the second question, Appellant contends the plain language of article
102.002 does not provide for the assessment of non-resident witness fees paid
pursuant to article 35.27.  The State
counters by contending that it does.

            Prior
to its repeal in 1999, section (a) of article 102.002 provided:[12]

A person subpoenaed, attached, or recognized as a
witness, other than a witness entitled to
receive compensation under Article 35.27 of this Code, is entitled to
receive $1.50 per day in attendance in court and six cents per mile traveling
to or returning from the trial.  In order
to receive compensation under this article, the witness, or another credible
person representing the witness, must sign an affidavit stating the number of
days the witness attended the court and the number of miles the witness
traveled to and from the place of trial. 
The affidavit must be filed with the papers of the case. 

 (Emphasis
added.)

             Therefore, prior to the repeal of subparagraph
(a), the plain language of article 102.002 did not authorize a trial court to assess
non-resident witness fees paid pursuant to article 35.27 as costs of court.   Therefore,
the question becomes, by repealing subparagraph (a), did the Legislature intend
to remove that exclusion?  

            Any
analysis of the Legislature's intent in repealing subparagraph (a) is
complicated by the fact that in repealing that subparagraph, the Sixty-Sixth
Legislature also repealed subparagraphs (b) and (c), and then without making
reference to the repeal, amended subparagraphs (b) and (c) to include
procedures governing the prosecution and administration of misdemeanor offenses
in municipal courts.  See Act of May 22, 1999, 76th
Leg., R.S., ch. 580, § 11(a), 1999 Tex. Gen Laws. 3119, 3123, approved
June 18, 1999, effective September 1, 1999 (repealing subparagraphs (a), (b)
and (c)); See Act of May 30, 1999, 76th
Leg., R.S., ch. 1545, § 63, 1999 Tex. Gen. Laws 5314, 5329-30, approved June
19, 1999, effective September 1, 1999 (amending
subparagraphs (b) and (c)).  If the
intent of the Legislature had been the removal of the article 35.27 exclusion,
it seems the more simple solution would have been to repeal only that portion
of subparagraph (a).  Accordingly, an analysis
of the bill's history does not support the State's contention that witness fees
paid pursuant to article 35.27 are assessable as costs of court under article
102.002.

            Finally,
although counterintuitive to the ultimate position taken, the State argues that
no substantive change in the law was intended by the Legislature when it
repealed subparagraph (a).  We see no
reason to disagree with that analysis. 
If the Legislature did not intend to substantively change the provisions
of subparagraph (c), the repeal of subparagraph (a) did not expand the
assemblage of recoverable costs of court to include non-resident witness
expenses paid pursuant to article 35.27. 
Accordingly, we hold that article 102.002 does not provide for the
assessment of witness fees paid pursuant to article 35.27 as costs of
court.  Appellant's third issue is
sustained.   

Conclusion

            Having
determined that the trial court erred by requiring Appellant to reimburse the
State for the costs of his court-appointed attorney and the non-resident
witness article 35.27 reimbursement expenses, we modify the judgment in Cause
No. 58,210-A to clarify that the order to pay court costs does not include a
requirement that he pay $16,510.26 in attorney fees or $537.05 in witness fees,
and the judgment, as modified, is affirmed. 
The trial court's judgments in Cause Nos. 58,211-A, 58,212-A, 58,213-A, 58,216-A, and 58,217-A are affirmed.  

 

                                                                                                Patrick
A. Pirtle

                                                                                                      Justice  

 

Quinn, C.J. and Campbell, J., concurring.

 

Publish.











[1]We
note that while the judgment in each case states Appellant's first name as
"Viengkhone," the indictments in Cause Nos. 58,210-A, 58,211-A,
58,212-A and 58,213-A state Appellant's first name as
"Vienkhone."  Where names are
substantially the same in character and pronunciation, though slightly varied
in spelling, under the doctrine of idem
sonans, the variance is immaterial.  Jenke v. State, 487
S.W.2d 347 (Tex.Crim.App. 1972).





[2]See Tex. Penal Code Ann. § 22.02(a)(2) (Vernon Supp. 2009) and. § 29.03 (Vernon 2009).





[3]Cause Nos. 58,210-A; 58,211-A; 58,212-A.





[4]Cause
No. 58,213-A.





[5]Cause
No. 58,216-A; 58,217-A.





[6]At
various stages of the pretrial proceedings, two of Appellant's appointed-counsel
moved to withdraw from representation. Both motions were granted and new
counsel was appointed.





[7]The
Witness Fee Claim form, which is signed by the non-resident witness and
approved by the trial judge, requests the Comptroller of Public Accounts to reimburse
Potter County, pursuant to Tex. Code of Crim. Proc. Ann. article 35.27 (Vernon
2006), for expenses incurred by the witness, but paid by Potter County, on
account of her attendance as a witness in Appellant's case.





[8]Unless
a material change in his financial resources occurs, once a criminal defendant
has been found to be indigent, he is presumed indigent for the remainder of the
proceedings.  Tex. Code
Crim. Proc. Ann. art. 26.04(p) (Vernon Supp. 2009).





[9]Article 35.27 states, in pertinent part, as follows:

Every person subpoenaed by either party or otherwise required or
requested in writing by the prosecuting attorney or the court to appear for the
purpose of giving testimony in a criminal proceeding who resides outside the
state or the county in which the prosecution is pending shall be reimbursed by
the state for the reasonable and necessary transportation, meal, and lodging
expenses he incurs by reason of his attendance as a witness at such proceeding.

See Tex. Code Crim. Proc. Ann. art. 35.27, § 1(a) (Vernon 2006).

 





[10]For
convenience, we will cite provisions of the Texas Code of Criminal Procedure
throughout the remainder of this opinion simply as "article _______."  





[11]The
overall framework for the assessment of costs by a trial court in a criminal proceeding
is both convoluted and confusing.  Part
of this confusion is created by the fact that customarily bills of costs
prepared by court clerks do not reflect the authority by which those costs are
assessed.  Adding to the confusion is the
plethora of overlapping legislatively enacted provisions dealing with costs to
be paid by criminal defendants.  See, e.g., Tex. Alco.
Bev. Code Ann. §
106.12 (Vernon 2007); Tex. Bus. & Com. Code Ann. § 3.506 (Vernon Supp.
2009); Tex. Bus. Org. Code Ann. § 10.365 (Vernon Pamph.
Supp. 2009); Tex. Code Crim. Proc. Ann. arts. 17.42,
17.43, 17.441, 37.073, 42.037, 42.12, 42.22, 45.0216, 45.026, 45.041, 45.051,
45.055, 45.0511(c-1), 45.0511(f)(1 - 2), 45.052,
45.203, 62.353, 102.001 - 102.072, 103.0031 (Vernon 2006 & Supp. 2009);
Tex. Edu. Code Ann. §37.011
(Vernon Supp. 2009); Tex. Fam. Code Ann. §§
8.262, 8.267, 8.302, 8.303, 45.106, 53.03, 54.032, 54.0411, 54.0461, 54.0462,
54.061, 81.003, 108.006, 110.002, 110.004, 110.005, 158.319, 158.403, 158.503,
160.762, 232.013 (Vernon 2006, 2008 & Supp. 2009); Tex. Gov't Code Ann. §§ 25.0593, 25.0594,
25.1572, 25.2223, 30.00014, 30.00147, 41.258, 51.601,  51.702 - 51,703, 54.313, 54.403,54.745,
54.663, 54.913, 54.983, 54.954, 54.1116, 76.015, 82.0361, 102.001 - 103.033,
411.081 (Vernon 2005 & Supp. 2009); Tex. Health & Safety Code Ann. §§ 161.255, 469.004,
821.023 (Vernon 2010); Tex. Hum. Res. Code Ann. § 152.0522 (Vernon 2001);
Tex. Local Gov't Code Ann. §§
118.131, 132.002, 132.003, 133.101 - 133.154, 191.007 (Vernon 2008 & Supp. 2009);
Tex. Parks and Wildlife Code Ann. §§
12.110, 12.308 (Vernon Supp. 2009); Tex. Transp. Code Ann. §§ 284.2031, 521.026,
521.048, 542.403, 542.407, 545.412, 548.605, 601.263, 706.006 (Vernon 1999,
2007 & Supp. 2009) (not intended as an exhaustive list).  We encourage court clerks to draft their
bills of costs in a manner that would allow a reviewing court to determine the
legal authority upon which a particular fee is based.  Furthermore, as pointed out by the concurring
opinion of Justice Campbell, as it currently exists, article 102.002 does not
provide for the assessment of any fees. 
Accordingly, we encourage the Legislature to consider clarification of
this article in particular and the entire court costs scheme in general.





[12]See Act of May 17, 1985, 69th
Leg., R.S., ch. 269 § 1, 1985 Tex. Gen. Laws 1300, 1302.